I'll begin with what I think is the most complex and contentious issue on this appeal, which is the issue of interstate commerce and the instrumentality of interstate commerce. An instrumentality of interstate commerce, such as to be subject to Congress' power to regulate it under the Commerce Clause, is basically of two types. The first is something which is used as an instrument of interstate commerce. In the context of the telephone, that would be a phone used to make an interstate call, to make a call across state lines. In that context, a bomb call made across state lines would itself be interstate commerce in the same sense as lottery tickets or goods made with child labor crossing state lines, and would bring us into what the United States v. Lopez would call Category 1, things passing through the channels of interstate commerce. And that's not what we have in this case. Mr. Dela Cruz did not make an interstate call. He made a call just only from point A to point B on the island of Saipan. The second type of instrumentality subject to Commerce Clause regulation is something whose in-state use has such a close and substantial relation to interstate commerce that incidental regulation of its in-state use is necessary to the effective regulation of the interstate commerce. This is the integral part rule or the substantial relation rule, such that the regulation of interstate commerce would be undercut if you did not also reach the in-state activity. This would be like the railroad cars in the Southern Railroad case, the bridge in the Overstreet case, the telephones in Weiss v. United States. And here in this case we have no effect on interstate commerce even being alleged or charged in this case, although there is a possibility of such a charge under the statute. And that brings us into what Lopez would call both Category 2 and Category 3. I think that's a key point to this case, is that as we've demonstrated in various cases cited in our briefs, that the standard for Category 1 instrumentalities and Category 3, other activities substantially affecting interstate commerce, is identical and has always been identical. In fact, it's the test. If you'll help me understand exactly what your theory is, we have said in Clayton that a telephone is an instrumentality of interstate commerce. We said that. And that seems to be A, self-evident, and B, binding. Now, I understand you're backing off of that in some way that would allow this panel to somehow ignore Clayton. That's correct. And that is because an instrumentality of interstate commerce is not used in interstate commerce when it's for a local call? Is that sort of a summary of it? Well, here's what I think the Court should do with Clayton. I think what happened, unfortunately, in Clayton is that the Court fell into what I would call the post-Lopez instrumentality's trap. The idea that there is no other instrumentality of interstate commerce. And that's the law that binds this panel. So what do you propose that we do with it that is sensible from your point of view? Either of two things, Your Honor. One of which is I think Clayton can be distinguished on its facts. I think the – Clayton reached what's the correct result, but reached it through faulty reasoning. I think when you look at Clayton, you find a situation where there is this substantial relation with interstate commerce. For example, the cloned phones, the possession of cloned phones, just like the possession of illegal drugs or the possession of parts of an endangered species, creates a market in interstate commerce and in that way has a substantial relation. Likewise, the illegal phones compete with legitimate phones that are in interstate commerce and thereby also have a substantial relation. And as we pointed out in our brief, there's an inability to segregate between the interstate and intrastate use of these phones in the same way that there's the inability to segregate in the Weiss case between which kind of cause you're intercepting with your wiretap and so you have to reach both of them. So applying the correct substantial relation test would result in the same holding and the same conclusion in Clayton as the Court actually reached. However, so I think on that basis, Clayton is distinguishable on its facts and the instrumentalities, the term instrumentalities in Clayton. What's your fallback? If that doesn't work, Your Honor, and if this Court, basically if Your Honors think I'm right about the Commerce Clause and about the instrumentalities rule and the Supreme Court's, how that's developed over history, but yet feel constrained by Clayton and the Constitution. I mean, I guess I can tell Your Honors, just go ahead and say so and we'll take it from there. Well, I guess I don't quite understand the argument. The telephone that was used is something that can call any place, right? Excuse me? The telephone was a telephone that could call any place. No, the telephone could only call Like a hotel telephone? The telephone was restricted to calls on the island of Saipan. You could call directly only on the island of Saipan unless you had used a card with a 1-800 number. And using that you could call off-island. Could anybody call in, however, from the out? Yeah, anyone could call in. All right. Doesn't that make the difference? It was used and could be used in interstate commerce. It could be used in interstate commerce. It was not so used. So why doesn't Clayton apply? Clayton Well, like I said, I think Clayton can be distinguished on its facts. Clayton was dealing with a different a different situation where there is the the proper substantial relation creating the nexus with interstate commerce, which doesn't exist in this case. There is no such nexus. No nexus. Yes, no nexus with interstate commerce, either through the use in interstate commerce or through the substantial relation. There is no separate category for instrumentalities or for telephones, per se. That is that is it has been the instrument the rule for instrumentalities and the rule for other economic activities affecting interstate commerce has been the same for all through the Supreme Court's jurisprudence on the Commerce Clause. And, in fact, the requirement of a substantial relation actually originated for instrumentalities. That was the original context where that rule was developed, back in Southern Railroad, the Shreveport case, even further back into the into the 1800s and 1870s, the old case of Daniel Barr. I assume on your theory it would be okay for me to send some anthrax to somebody in City Hall in San Francisco from here. Is that okay? In the mail. In the mail. I'm just going to mail it right here and send it to City Hall. Is that okay? Well, Your Honor, it's certainly not okay, whether it's prohibited by the Federal Regulation. No, but I mean it's free from Federal regulation as long as I deposit it in the mail here addressed from here to City Hall in San Francisco. I think when you're talking about the mail, the mail raises separate issues. There's a separate constitutional power regarding the post office, which would come into play that doesn't come in here. Insofar as we're talking about the Commerce Clause, then it would depend on whether doing so had any substantial relation to interstate commerce, such that you'd have to reach the in-state conduct in order to regulate the interstate commerce. And if there was no such nexus, then, yeah, that would be beyond Federal powers. Okay. That's interesting. So if I used to ride a train that had a, from Chicago downstate Illinois, it had the last car was always just to go to the place where I was going, and then they'd detach the car. So if you bombed that car with the people that were just going to a stop in Illinois, there would be no, it would not Really, I think, Your Honor, that brings us in, that's almost exactly Would that have any nexus to interstate commerce? Well, I think that would Is that the argument? I think that would have a nexus. I think that's exactly the situation the Supreme Court faced in the Southern Railroad case, where you had, they were regulating the safety of cars, railroad cars, which were used only in interstate commerce. And the nexus was that in order to protect the interstate commerce Well, cars are used in intrastate commerce. Railroad cars are. That's the Right. They're used in intrastate commerce, and they're used in interstate commerce. If you bomb the car that happens to be only going to go from one place in the state to another place in the state, under your theory, that's not No, I think that would be reached. I think that would be reached by the commerce power because you have the nexus to interstate commerce of that car traveling on the same tracks and being part of the same train with the interstate cars. And so What's the difference? What's the difference? You pick up the phone, and if you dial one number, you're in San Francisco, and if you dial this number, you're in Saipan. You may have to have a call, just as I might have to have some way to get long distance from my phone. I have to pay, but Well, the difference is just this, is that there's, when you're, there's an interrelationship among railroad cars. I mean, the safety and the safety of the interstate commerce depends on the safety of the cars even used only only in state. And that was the Southern Railroad case. They there's a the safety and security of each is dependent on the others. That's not the case with telephone calls. Telephone calls. Each one is just a separate and discrete communication. They don't they don't collide with each other. They don't bump into each other. They're not interacting in any way such that in order to protect the stuff going in interstate, you need also reach what's what's in state. And that's the distinction. The it's really interesting distinction. It's really the a what I'd have to call a supreme Morrison are being interpreted as expanding the commerce power in the sole limited area of instrumentalities. Certainly, the whole tenor of those cases was, if anything, to to narrow the commerce power. And and this is since it's always been a single rule applicable to instrumentalities and other and other matters. It's like you can't you can't tie up a dog over here and leave its tail wagging all by itself over there. It's always been one dog. And what the court did in Lopez is tied up the whole dog. Now, this reading that we've seen since then, where if you can, if something can be an instrument of commerce, then if it can be, then it always is. It just goes around the back of Lopez, where Lopez plugged the dike over here. The water just starts coming out on the other side because it opens the door to this boundless power of regulation where anything that's ever used as an instrument of commerce, the street, a car could be gasoline, could even be the air which is used to transmit radio waves and airplanes. Anything that's ever used as an instrument of commerce is always subject to congressional regulation under the Commerce Clause. That's the import of this per se instrumentalities rule. And that gets you into, you know, if the street is if a robbery is committed on a street, then federal power could reach that because of the street. An instrument of commerce was used. If a drive by shooting is committed from a car, then you've got because a car was involved. Somehow there's federal jurisdiction. If a computer is used for anything because a computer can be used to transmit email or get on the Internet or engage in interstate commerce, that means that even when it's just used for word processing, something you could do just as well on a typewriter and has no bearing on interstate commerce at all, that that still can be reached. That's the import of this rule. It's a boundless federal police power of just exactly what the Court was trying to get away from in Lopez and Morrison. You have to at some point, it must lose its character as an instrument of interstate commerce depending upon its use. MS. NISBETT. Mr. Freeman, may I turn for a few moments, please, to the diminished capacity downward departure issue? Arguably, Walters controls. But I'd like to hear from you, if you would help me, why there isn't a distinction with Walters along the lines of whenever a threat is made to the President, which is what was at issue there where we said, ah, but he didn't seriously intend to hurt the President. The argument here would be, well, it's the same thing. He didn't seriously intend to bomb the building. He just meant to scare them. Why isn't there a distinction in that, you know, the President is surrounded by Secret Service, and when you threaten the President by picking up a phone in Vermont or wherever, it goes into some Secret Service data bank, and it's not regarded as being a serious possibility of really injuring the President. Whereas every time one makes a bomb threat to a public building, a school, a courthouse, a government building, it's automatically taken as serious, and the building is generally evacuated. Why isn't that on its face, a serious threat that requires separation for the full amount of time specified by statute in order to protect the public? First of all, I don't think it's necessarily true that it is always taken, or that there is any distinction between how seriously those things are taken. Well, to a courthouse, you know, I've had my courtroom, you know, as a trial judge, vacated because some poor guy forgot to take his briefcase out, and the whole building, you know, is evacuated while they bring in the dogs to check to see whether there's a bomb in a briefcase. It turns out to be a moldy ham and cheese sandwich. I mean, they are taken seriously in a courthouse. So why isn't that a basis for distinction? Well, I think when the, certainly there's, when you talk about taking something seriously, that's an expression that's subject to some different interpretations. I know, which is why I wanted to have a conversation with you. What happens, certainly what happened in the courthouse in this case, as the testimony was, is people just filed out, said, well, here we go again. There had been testimony from the officers. There had been a lot of bomb calls at different points. One is that they evacuate the building, and it's a big deal. Right. And in the case of threats against the President, you know, some kind of action and evaluation has to be taken in response to any threat. If they don't evacuate the White House every time somebody makes a threat against the President, I mean, it's filtered through the Secret Service, and that's probably usually the end of it. Well, I think what the guideline is calling for is an evaluation of the seriousness of the threat, not the seriousness of the response to it. Maybe that's the short answer. And in terms of that guideline, I would also want to point out that that guideline was recently amended, and the old guideline said it has to be a crime of nonviolent offense. Okay. And that created a split in the circuits. It created some dissension within circuits, particularly with respect to the question of how that relates to a threat which the person does not have the ability or the intention to carry out. I think one of the cases that resulted in the amendment was a Seventh Circuit case of POFF, P-O-F-F, 926 F. Second, 588, where part of the problem with it was the concern of the dissenters for the justice or injustice of the application or the denial of the application of that guideline to somebody who made a threat that had no ability or intention to carry it out. And as a result of that sort of history, you have this newly amended guideline talking about a serious threat, which I think needs to be looked at in the light of that history as well. Okay. Thank you. I'll reserve the rest of my time for rebuttal. Thank you. May it please the Court, my name is John Rice, Assistant United States Attorney for the Northern Mariana Islands. And, Your Honor, the first issue I would like to address is the Clayton case. And as the Court pointed out, I think that basically what counsel is arguing is that this panel overruled Clayton and disregarded the language in Clayton that clearly said that telephones are instrumentalities of interstate commerce and clearly laid out that they fell within Category 2 of LOPEZ. The government would submit that, as the Court found in Clayton, that in this case, once the Court ascertains that a telephone was used to make the threat, then there is no further inquiry necessary in regard to the interstate commerce. I would just like to make one other point on that in regard to counsel's attempt to distinguish individual phone calls from railroad cars and how he says that phone calls are separate and that they don't have any effect. One phone call doesn't have an effect on any other phone call. And I think when you think about that, it's not really true. And I think it helps explain why instrumentalities of interstate commerce like telephones do fall under the Commerce Clause. And look at bomb threats. For instance, the evidence in this case showed that after 9-11, there were significant number of bomb threats being made in Saipan, in the CNMI. As a result of that, what is very possible is that people would be using telephones and businesses, schools, courthouses, individual employees, if not a general policy. We want to avoid court being canceled. For instance, the judges in this case, within several weeks, on three separate occasions, had their calendars canceled. They don't want that to happen. They tell the clerk's office, from 2 o'clock to 5 o'clock, don't answer the phones. And that is going to have an effect. Let them blow us up instead? Is that the notion? No, I don't think so, Your Honor. I think what it means is that if the person's going to make the threat, they have to do it in a different way. They have to come in person. They have to come and really do it. Well, I don't – well, I mean – Never mind. I'm sorry. Okay. No, I think – but the point is, is that it's much less likely that if someone is going to make a threat, if they don't intend to carry it out, and if it's a threat just to disrupt, but to be taken seriously, then the phone is much more of a danger because of the anonymity. You don't answer the phones. If someone wants to make a threat, they have to come in person, and then they're exposing themselves much more to the possibility of prosecution. And quite frankly, Your Honor, if there is a real danger and there is going to be a bomb, I don't think you're going to get the threat. They're going to put the bomb in, and they're not going to alert you that it's there. And absent any further questions on that point, I'll move on. The other thing I would just address as to appellant's argument in his reply papers that the government's position means that any use of a phone, albeit a phone – if you write on the back of a phone that there's a bomb and therefore that use of the telephone would constitute a violation of 844E. And I don't think that's the case. I think it's clear from the language of the statute that it's a telephone call. The statute makes clear that it says telephone, telegraph, or other. Well, what about a house call? I mean, the use of a house phone in a hotel. I think if a house – Is that in interstate commerce? I don't – if it's not – if it's completely disconnected from the – One of these little phones where all you get is the – I do not believe that falls under 844E because that is not an instrument of interstate and foreign commerce. And people can't call into that line. Precisely. As they can in this case. Yes, I think as you pointed out, Judge Nelson, even if there are restrictions on outgoing calls – and there were some restrictions, but they could be made with calling cards – calls could come in. And that was established at trial, that international, interstate, foreign calls could be taken on these phones directly. Mr. Rice, the flip side of the question that I was just talking with Mr. Corey about, why aren't we bound by WALTRs? Your Honor, I think WALTR is distinguishable along the lines of what you spoke of earlier. I think that the threats to the president are different. I think they're much more numerous and they're dealt with in a different fashion. I think it was clear in WALTR that there was no evacuation. There was no – necessarily an altering of the president's schedule. Not to say that there can't be a threat to the president that would require the exception. Because if it is made and it's made by someone who has the wherewithal to carry it out and it's treated by the Secret Service and it does result in an evacuation, then I think that it could – the exemption could apply. And I think in this case it's important to know that Judge Munson, in making that ruling, had sat through trial, had heard the threats, had heard evidence about the threats, had heard what would happen. So I think when the court found that this was exempted as a serious threat, you consider both the generic fact that it was a bomb threat to clear a building as well as the evidence in this case of what actually happened. Well, here it's not disputed that Dela Cruz never possessed any real intent to cause physical harm. Isn't that true? Well, I think based on his statements, and there was no reason to – Was there any evidence that he – that his statements were incorrect? No, Your Honor. So that's why it seemed to me it was undisputed. Doesn't that compel us to send it back and for the district court to determine whether Dela Cruz did suffer from a reduced mental capacity here? No, Your Honor, because I think there's more than sufficient evidence to show why he made the threats. The making of a bomb threat without the intent to carry it out. It wasn't like a diary or something? Excuse me, Your Honor? The threat was real? Absolutely. The threat was real, and what the evidence established was that he made the threat with the intent that it be taken seriously. Not necessarily that he intended to carry it out, but the government was – What does Walter say about that? I thought Walter talked about possessing a real intent to cause physical harm. No, I believe a serious threat to cause physical harm, not intent to carry it out. I think that Walter does not require the actual intent to carry it out. I think the same exemption that applies for the jury instruction for the threat, that it did not have to be a true threat, still applies, and that the mental capacity reduction is exempted if someone makes a true threat. The government need not prove, nor the court find, that there was the intent to carry it out. The issue there is whether there was a true threat in the sense that the person making the threat intended for the person receiving the threat to take it seriously, which we clearly had here. In fact, there was testimony from Ms. Kazuma from the emergency management office, when she received it, that she was trembling and shaking when she received it, and I clearly think the government established that. So absent any other questions, Your Honor, the government would submit. Thank you. Thank you. Thank you. Your Honor, first of all, with respect to one of the points made on the commerce issue by Mr. Rice just now, in terms of people becoming reluctant to answer their phones because there's a lot of bomb threats being made, that's something that there wasn't any evidence of in the record as to that that that was happening or what effect, if any, that had on interstate commerce. And I think had there been such evidence, what you're talking about is looking to the effect on interstate commerce, and he was never charged with having any effect whatsoever on interstate commerce. This was made to rest wholly on it just being a telephone. And when you do start talking about things like the cause, like people becoming reluctant to answer their phones or other things that, as you start piling one on top of another, ultimately may affect commerce, I think what you're talking about is exactly the sort of reasoning that Lopez and Morrison reject in the context of non-economic activities, this kind of aggregation of things that, as it builds up, affects commerce in the long haul. That's not the kind of reasoning that's that's going to sustain Commerce Clause jurisdiction under under existing case law. I would also point out that I think the it's an interesting I'd call a concession that the government made here, that it must actually be an instrument of interstate commerce that using something because as as the statute is set up, it's or other instrument of interstate commerce. And that's something such as a phone that's used as a writing service or using a phone as a weapon or something like that is not is not covered. That's a different position from what the government took in the district court. And I think it's that they're correct here rather than there, that it must be an instrument of interstate commerce. And what we're left with is the question of what is an instrument of interstate commerce. And that that is something to be determined by by its use or by a substantial relation of its of its in-state use to interstate commerce. Thank you. Thank you. It's just argument is submitted for decision. Move the court's calendar for this morning and the court stands adjourned. We did. It was the first time for that too. Thank you.
judges: Schroeder, D.W. Nelson, Rymer